OPINION
Defendant-appellant, Robert Skidmore, appeals his conviction in the Warren County Court of Common Pleas for felonious assault.
Appellant was indicted in May 1999 on one count of felonious assault in violation of R.C. 2903.11(A)(1) and one count of felonious assault in violation of R.C. 2903.11(A)(2), both second degree felonies, and one count of criminal damaging in violation of R.C. 2909.06(A)(1), a second degree misdemeanor.[1] The charges stemmed from an incident that occurred in the early morning hours of March 19, 1999, wherein appellant, along with Otis Hensley ("Hensley"), allegedly assaulted Robert King ("King") with pool cues and/or beer bottles at the Silver Bar in Franklin, Ohio. King suffered numerous injuries to his face, hands, and arms. As a result of the assault, King is now legally blind in one eye and suffers from headache "behind [his] eyeball." Appellant pled not guilty to the charges. The case was tried to a jury on October 4 and 5, 1999.
At trial, the state of Ohio presented the testimony of King as well as the testimony of three law enforcement officers who responded to the scene after the altercation: Franklin Police Officers Stephen Dunham and Brian Pacifico, and Warren County Deputy Sheriff Christopher Brombaugh. King's testimony can be best described as a litany of what he did not remember and did not know rather than what he remembered. As King testified, "I don't remember that night very much at all." Despite King's near lack of memory, the following facts were established:
On the night of the incident, King and his brother-in-law went to the Silver Bar. This was the first time King had been to this bar. King admitted that he had been drinking before then and that he was intoxicated. King believed he was eventually asked to leave the bar because he, appellant, and Hensley became involved in an argument. Upon leaving the bar, King was struck from behind. King fell and was subsequently repeatedly hit. King testified the beating stopped at the same time he heard police sirens.
King testified he did not know appellant or Hensley. King did not remember (1) who was in the bar when he first arrived, (2) seeing appellant and Hensley there or having contact with them, (3) what happened when he was in the bar, or (4) leaving the bar. Asked on cross-examination whether "[he could] sit here today and tell the jury that [appellant] assaulted [him] in any manner," King replied "[n]o, I couldn't say that."
Police Officer Brian Pacifico was dispatched to the bar at about 2 a.m. On his way there, he observed a car coming from the bar area. Upon learning that the people in the car might have been involved in the altercation, Officer Pacifico turned his cruiser around and followed the car. The officer pulled the car over after it ran a red light. The officer recognized the driver as appellant. Hensley and a young woman, Shelby Carnes ("Carnes"), were passengers. Officer Pacifico noticed that Hensley had blood, grass, and dirt on his hands and clothes. Appellant, by contrast, did not have any grass or dirt on his clothes and did not have blood on his hands. Officer Pacifico testified, however, that appellant had "blood or something on his left side of his leather jacket[,] * * * kind of small; possibly splatter." Neither appellant or Hensley appeared injured. Neither complained of injury.
Officer Pacifico put appellant in the back of his cruiser after appellant failed several sobriety tests. Carnes was arrested for disorderly conduct and placed in another cruiser. Both cruisers went back to the bar. Although he could not recall why, Officer Pacifico eventually put Carnes in the back of his cruiser with appellant. The cruiser was equipped with a video camera. While Officer Pacifico was investigating the altercation, the video camera recorded a conversation between appellant and Carnes during which appellant stated "I'm scared to death about [Hensley]. He beat that guy bloody. We both did."
Police Officer Stephen Dunham was also dispatched to the bar at about 2 a.m. but immediately left to assist Officer Pacifico with the traffic stop of appellant. Officer Dunham testified that the car driven by appellant matched the description of the suspect car leaving the scene of the altercation. While Officer Pacifico was dealing with appellant at the traffic stop, Officer Dunham dealt with Hensley. Both appellant and Hensley appeared to be intoxicated. A videotape of the traffic stop shows a fairly upset Hensley trying to tell Officer Dunham what had happened at the bar. Hensley told the officer he had been hit in the arm with a pool stick. Thereafter, Hensley described the ensuing physical altercation. Hensley did not deny he and the other person (King) were fighting.
Deputy Christopher Brombaugh arrived at the bar at 2:14 a.m. Upon arrival, he observed King slumped in the parking lot lying in a pool of blood and bleeding excessively. The deputy described the scene as follows: "it appear[ed] as if someone ha[d] grabbed [King] by his feet and dipped him to the middle of his thighs in blood and sat him there." King was in and out of consciousness. Due to the massive injuries suffered by King, the deputy did not think he was going to live. Once King was put in an ambulance, the deputy started collecting evidence at the scene. Dep. Brombaugh collected several broken pool cue sticks, an unbroken beer bottle with hair and blood on it, the neck of a bottle, and several broken beer bottles. There were also several pools of blood at the scene. Despite sending this evidence to a laboratory for testing, the deputy was unable to obtain fingerprint identification, including of the victim. Although he did not know why, the deputy also testified that blood and serology tests were never completed.
Clothes worn by appellant and Hensley at the time of the altercation were part of the evidence. Hensley's shoes, jean jacket, flannel shirt, tee shirt, and jeans were all saturated with blood. By contrast, there were "no real noticeable amounts of blood" on appellant's shoes. Appellant's socks had "a little bit of blood" while his leather jacket had "a few little spots." Appellant's jeans had "a smudge of blood" in the crotch area. Dep. Brombaugh testified that when Officers Dunham and Pacifico came back to the scene with appellant and Hensley, a witness identified the latter two as the individuals involved in the altercation with King. Based upon statements from unidentified witnesses, it was also the deputy's testimony that appellant was involved in the altercation.
On October 5, 1999, a jury acquitted appellant of the R.C.2903.11(A)(1) felonious assault charge but found him guilty of the R.C. 2903.11(A)(2) felonious assault charge.[2] Appellant was subsequently sentenced accordingly. This appeal follows in which appellant raises two assignments of error which will be addressed in reverse order.
In his second assignment of error, appellant argues that he was denied effective assistance of counsel because trial counsel failed to (1) object to the videotape of the traffic stop during which Hensley allegedly stated that both he and appellant were involved in a fight at the Silver Bar, (2) object to the videotape of the conversation between appellant and Carnes, (3) move to suppress the foregoing videotape, (4) object to King's direct examination when it was clear King lacked first hand knowledge of crucial aspects of the incident, specifically the identity of his attackers, and (5) suppress evidence that appellant was driving under suspension when he was pulled over by Officer Pacifico.
To establish a claim of ineffective assistance of counsel, a defendant must first show that his counsel's actions were outside the wide range of professionally competent assistance. Second, the defendant must show that he was prejudiced by reason of counsel's actions. Strickland v. Washington (1984), 466 U.S. 668,687, 104 S.Ct. 2052, 2064. Trial counsel's performance will not be deemed ineffective unless the defendant shows that "counsel's representation fell below an objective standard of reasonableness," id. at 688, 104 S.Ct. at 2064, and that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Statev. Bradley (1989), 42 Ohio St.3d 136, 143, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258. The defendant bears the burden of proving ineffective assistance of counsel. State v.Hamblin (1988), 37 Ohio St.3d 153, 156, certiorari denied (1988),488 U.S. 975, 109 S.Ct. 515.
A properly licensed attorney is presumed competent. Vaughn v.Maxwell (1965), 2 Ohio St.2d 299, 301. Any questions regarding the effectiveness of counsel must be viewed in light of the evidence against the defendant, Bradley, 42 Ohio St.3d at 142, with a "strong presumption that counsel's conduct falls within the wide range of professional assistance." Strickland,466 U.S. at 689, 104 S.Ct. at 2065. A reviewing court cannot use the benefit of hindsight in determining whether a defendant received effective assistance of counsel. Id. Thus, it is not the role of an appellate court to second guess the decisions of trial counsel.State v. Baker (Aug. 23, 1999), Clermont App. No. CA98-11-108, unreported, at 18. A presumption exists that "under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. Where trial tactics prove unsuccessful, an appellant is not allowed to later claim that such tactics were inappropriate.State v. Carter (1995), 72 Ohio St.3d 545, 558, certiorari denied (1995), 516 U.S. 1014, 116 S.Ct. 575.
We note at the outset that with regard to the videotape of appellant's traffic stop, appellant is not arguing that trial counsel was ineffective for failing to move to suppress it as evidence. Rather, appellant is simply arguing that trial counsel was ineffective for failing to object to it. We now turn to the five sub-issues raised by appellant which will be addressed out of order.
Appellant first argues that trial counsel was ineffective for not moving to suppress evidence that appellant was driving under suspension on the night of the incident. The traffic stop videotape shows Hensley pleading with Officer Pacifico, as the officer was arresting appellant for driving under the influence, to "give [appellant] a break" as appellant "is trying to get his license back." The officer's answer to Hensley refers to appellant driving under suspension. At trial, the officer testified that Hensley "wanted to speak to me regarding the arrest of [appellant] and advising that basically that he was trying to get his license back, and he didn't need this."
Even if we were to assume, for the sake of argument, that counsel's failure to object to such evidence could be attributed to the violation of his essential duties and not mere trial tactics, appellant cannot satisfy the prejudice prong of theStrickland test. We cannot say that, but for trial counsel's error, the result of the trial would have been different, that is, that the jury would have acquitted appellant of felonious assault without the evidence at issue. We therefore find that trial counsel was not ineffective for not moving to suppress evidence of appellant driving under suspension.
Appellant next argues that trial counsel was ineffective for failing to object to a portion of King's testimony on direct examination. Appellant specifically challenges the following examination of King by the prosecutor:
 A. I believe I was we was [sic] asked to leave, I believe.
 Q. And why was that?
 A. Because well, I'm just I don't actually, I can't remember. I'm just going by what I was told, because it was we had got [sic] into an argument.
 Q. Who had gotten into an argument?
 A. Well, I guess all me and Phil and some other guys had.
 Q. Okay. And the other guys being [appellant] and Otis Hensley?
 A. I'm assuming; yes.
 Upon reviewing King's direct examination, we find that trial counsel was not ineffective for failing to object to King's "assuming" answer. It was unequivocally clear from King's direct examination both before and after the foregoing exchange that King did not remember any of the crucial aspects of the altercation, such as the identity of his attackers or the weapons used to assault him. In addition, any prejudice that might have resulted from the foregoing exchange was minimized, if not eliminated, when King admitted on cross examination that he could not sit before the jury and "tell [them] that [appellant had] assaulted [him] in any manner."
Appellant next argues that trial counsel was ineffective for failing to object to the traffic stop videotape and to the videotape of his conversation with Carnes. Upon a thorough review of the record, we find that trial counsel's decision not to object to them was a tactical decision.
The record shows that trial counsel's theory of the case at trial was that King and Hensley were the ones involved in the altercation, that appellant was struck with a pool cue by King's brother-in-law, that after appellant unsuccessfully ran after that person, he came back to the bar to pick up Carnes and Hensley, and that he was pulled over while driving away.
During opening argument, trial counsel told the jurors that during trial, they would see various videotapes submitted by the state. Trial counsel told the jurors that on the traffic stop videotape, they would see that "Hensley keeps trying to tell the officers that [appellant] had no involvement in the altercation." With regard to the videotape of appellant's conversation with Carnes, trial counsel told the jurors "you will hear [appellant] and a very intoxicated Miss Carnes have a conversation about that night's happenings. You will hear various statements, and it's up for you to interpret what these statements actually mean."
At trial, during a side bar conference called by the trial court, and after the traffic stop videotape was shown to the jury, the court expressed concerns that "for the last 45 minutes or so there ha[d] been considerable hearsay presented to the jury without objection made from either side." The court was particularly concerned "with regards to the hearsay that ha[d] gotten in that might be damaging to [appellant]. The court went on to state that "[c]ounsel for [appellant] now tells me that they feel it is of some strategic advantage to their client for the jury to hear some statements made by various people who would not otherwise be able to testify; information that the jury would not otherwise hear."
With regard to the traffic stop videotape, the record further shows that trial counsel's decision to show the videotape was also for the very purpose of showing the contrasting appearance between appellant and Hensley with regard to blood, grass, and dirt on their clothing. The decision to show the traffic stop videotape was thus a calculated decision made by trial counsel.
With regard to the videotape of appellant's conversation with Carnes, the record shows that both parties disagreed as to what appellant actually said. The state argued that appellant admitted that both he and Hensley beat King. Trial counsel argued that appellant simply stated "we both" before Carnes interrupted him by saying "did he?" The decision to show the videotape of appellant's conversation with Carnes was thus a calculated decision made by trial counsel to discredit the state's theory that appellant confessed beating King, when he said "he [Hensley] beat that guy bloody. We both did."
In light of the foregoing, we find that trial counsel's decision to show the videotapes was a tactical decision. We cannot say that trial counsel was ineffective for making such decisions. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it had proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
Appellant argues, however, that trial counsel was ineffective for failing to move to suppress the videotape of appellant's conversation with Carnes in the back of P.O. Pacifico's cruiser. Appellant argues that trial counsel should have filed a motion to suppress the videotape on the grounds that the conversation was an unlawful custodial interrogation and that the circumstances of the conversation raised constitutional concerns.
It is well-established that a defendant's right to effective assistance of counsel does not require defense counsel to file a motion to suppress evidence where none of the defendant's constitutional rights were violated. State v. Lott (1990),51 Ohio St.3d 160, 175. Upon reviewing the record, we find that trial counsel was not ineffective for failing to move to suppress the videotape for the following two reasons.
First, it is well-established that "a person does not have a reasonable or legitimate expectation of privacy in statements made to a companion while seated in a police car." U.S. v. Clark
(C.A.8, 1994), 22 F.3d 799, 802; see, also, State v. Wynter (Mar. 13, 1998), Miami App. No. 97 CA 36, unreported. As the Eighth Circuit Court of Appeals observed:
 A marked police car is owned and operated by the state for the express purpose of ferreting out crime. It is essentially the [officer's] office, and is frequently used as a temporary jail for housing and transporting arrestees and suspects. The general public has no reason to frequent the back seat of a patrol car, or to believe that it is a sanctuary for private discussions. A police car is not the kind of public place * * * where a person should be able to reasonably expect that his conversation will not be monitored. In other words, allowing police to record statements made by individuals seated inside a patrol car does not intrude upon privacy and freedom to such an extent that it could be regarded as inconsistent with the aims of a free and open society.
 Clark, 22 F.3d at 801-802.
In the case at bar, appellant and Carnes had already been arrested before being put in the back of Officer Pacifico's cruiser. Even though the officer did not inform them that the video camera was running, appellant and Carnes could not reasonably have expected that their conversation would be private or would not be overheard, monitored, or recorded.
Second, an interrogation, as conceptualized in Miranda v.Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, must reflect a measure of compulsion above and beyond that inherent in custody itself before it will be considered a "custodial interrogation."Rhode Island v. Innis (1980), 446 U.S. 291, 300, 100 S.Ct. 1682,1689. A custodial interrogation occurs when questioning is initiated by law enforcement officers. Innis, 446 U.S. at 298,100 S.Ct. at 1688 (emphasis added). It is axiomatic that the presence of a law enforcement officer is required before there can be an interrogation.
In the case at bar, while appellant was under arrest when he made the incriminating statements, such statements were not the product of police interrogation as they were not prompted or elicited by the officer in any way. In fact, it is clear from the videotape that the officer had already left his cruiser when appellant made the incriminating statements. Thus, appellant's statements were unprovoked and were voluntarily and spontaneously made without any coercion or inducement by the officer. We therefore find that appellant's conversation with Carnes was not a custodial interrogation. As a result, trial counsel's failure to move to suppress the videotape did not constitute ineffective assistance of counsel.
In light of all of the foregoing, we find that appellant was not denied effective assistance of trial counsel. Appellant's second assignment of error is overruled.
In his first assignment of error, appellant argues that his conviction is against the manifest weight of the evidence. Specifically, appellant claims that the state failed to show beyond a reasonable doubt that he caused or attempted to cause physical harm to King by means of a deadly weapon, to wit: pool cues and/or beer bottles.
Unlike a challenge to the sufficiency of the evidence, which attacks the adequacy of the evidence presented, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. State v. Thompkins (1997), 78 Ohio St.3d 380,386-387. In order for a court of appeals to reverse a trial court's judgment on the basis that a verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the fact finder's resolution of any conflicting testimony. Id. at 389. The standard for reversal for manifest weight of evidence has been summarized as follows:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
 Thompkins at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Upon thoroughly reviewing the record, we find that the evidence supports a finding that appellant assaulted King with pool cues and/or beer bottles. Certainly, the videotape of appellant's conversation with Carnes in which he admitted beating King supports appellant's conviction. However, even without the videotapes admitted as evidence, the record shows that appellant had some blood on his clothes. While appellant's clothes, unlike Hensley's, were not saturated with blood, they nevertheless had some blood. This is not inconsistent with the theory that appellant assaulted King with pool cues and/or beer bottles when the latter was not yet bleeding. In addition, Dep. Brombaugh testified that when appellant and Hensley were transported back to the bar, a witness identified them as the individuals involved in the altercation with King. It was also the officer's testimony, based upon statements from unidentified witnesses, that appellant was involved in the altercation.[3]
As noted, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. Although defense counsel's theory at trial was that only Hensley was King's attacker, the jury was in the best position to judge the credibility of witnesses and the weight to be given the evidence. Our review of the evidence fails to persuade us that the jury lost its way and created a manifest miscarriage of justice by doing so.
We therefore find that appellant's felonious assault conviction was not against the manifest weight of the evidence. Appellant's first assignment of error is overruled.
YOUNG, P.J., and VALEN, J., concur.
[1] The criminal damaging charge was dismissed by the state during appellant's trial prior to closing arguments.
[2] R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance[.]"
[3] This hearsay testimony was neither objected to at trial nor raised as an issue on appeal.